William Koch Motors, Inc. v. Commissioner.
William Koch Motors, Inc. v. Commissioner
Docket No. 54793.
United States Tax Court
T.C. Memo 1955-334; 1955 Tax Ct. Memo LEXIS 1; 14 T.C.M. (CCH) 1322; T.C.M. (RIA) 55334; December 30, 1955
*1 The petitioner, an automobile dealer, kept its books and reported income on an accrual basis. It sold deferred payment notes, secured by sales agreements, which it received in payment for automobiles, to a finance company. The finance company withheld part of its payment to petitioner for each note, as agreed upon with petitioner, as a dealer's reserve which it credited to petitioner's account on its books. Held, that in determining petitioner's taxable income for the taxable years, the amounts held as dealer's reserves and credited to petitioner's account on the finance company's books are includible in petitioner's taxable income. Shoemaker-Nash, Inc., 41 B.T.A. 417, followed. Ernest Woodward, II, Esq., Kentucky Home Life Building, Louisville, Ky., for the petitioner. Charles R. Hembree, Esq., for *2 the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined deficiencies in income tax for the fiscal years ended June 30, 1951 and 1952, in the amounts of $6,259.90, and $14,339.57, respectively. Certain adjustments in each year are uncontested. The question to be decided is whether amounts withheld in each taxable year by a finance company upon purchasing from petitioner automobile notes and security instruments, which amounts were credited to petitioner's reserve account on the finance company's records, are taxable income in the year in which petitioner sold the notes to the finance company. Findings of Fact All of the facts have been stipulated. The facts are found as stipulated. The stipulation and the attached exhibits are incorporated herein by this reference. The petitioner is a Kentucky corporation having its principal place of business at Louisville, Kentucky. It filed its income tax returns for the fiscal years ended June 30, 1951 and 1952, with the collector for the district of Kentucky. Petitioner was organized on June 30, 1948, for the purpose of buying, selling, and servicing new and used automobiles, *3 and this continued to be its business during the taxable periods involved in this proceeding. The petitioner kept its books and filed its tax returns on an accrual basis of accounting. A large part of petitioner's sales of automobiles were made under conditional sale agreements under which the purchaser, after making a down payment, agreed to pay the balance of the purchase price, plus finance charges and other charges, over a period of time. The conditional sale agreements provided that title to the car would remain in the "Seller or assigns" until all amounts due under the contract were paid in full, and that the contract might be assigned. At all times during the taxable periods involved, there was in force and effect between petitioner and Commercial Credit Corporation (sometimes hereinafter referred to as "Commercial") a "Reserve Agreement" pursuant to which petitioner sold automobile notes and the conditional sale agreements to Commercial. The "Reserve Agreement", which was addressed to Commercial, signed by petitioner, and accepted by Commercial, reads as follows: "1. We will sell to you, from time to time, acceptable notes, conditional sale contracts, chattel mortgages *4 or lease agreements, herein called 'Notes', acquired by us from retail purchasers of new or used passenger and/or commercial automobiles, herein called 'Cars'. Notes will be for amounts computed in accordance with the applicable charts issued by you to us for use in territories in which we sell Cars. "2. You will set up the following reserves, for our account, based on the cash unpaid balance, (cash selling price of Cars, less down payment): Over
12 months
12 months
New cars and trucks
3%
3 1/2%
1946 and later model
cars and trucks
4%
4 1/2%
1942 and older model
cars and trucks
8%
8 %
Minimum
$15.00
"No reserves are to be set up in respect to short term note, demonstrator or other unusual or special plans, announced by you from time to time except as may be hereafter agreed upon. As of January 31st, July 31st, and October 31st, you will pay to us the amounts by which reserves set up under this and any other Agreements, heretofore executed by us, exceed 5% of the total balances outstanding on all Notes purchased from us, provided that no payments need be made by you so long as any indebtedness we may owe to you at the time of settlement *5 above stated is unpaid, but such reserves may be held and applied by you against such indebtedness. "3. In consideration of the purchase by you of such acceptable Notes endorsed 'Without Recourse', we agree that if you repossess or recover any Cars covered by said Notes, for any reason, we will, upon delivery to us at our place of business shown above, repurchase such Cars, as is, from you, for cash. If such Cars are tendered to us within 90 days after the maturity of the earliest instalment in respect thereto unpaid at the time of such delivery, or if you are required by law to keep such Cars for redemption, or for any other reason, or where Cars are involved in litigation or are held by or under the jurisdiction of any court or governmental agency for any period for any reason, we will accept delivery of such Cars as soon as you can make delivery thereof notwithstanding that it may exceed the 90 day period above mentioned and we will pay you for such Cars, in cash, an amount equal to the unpaid balance owing on the Notes relating thereto. If you should be unable to repossess such Cars within 90 days after the default of any instalment of the Notes in respect thereto, and such default *6 shall have continued during such period, we will purchase such Cars from you at such time as you can make delivery thereof and we will pay you therefor the value of the Cars, as is, at the time they are returned, such value to be determined in accordance with the appraisal clause of standard fire and theft policies. Until repurchased by us, you may store such repossessed Cars on our premises without cost, and our possession of such Cars shall be merely as a bailee with the duty to safely store for you and redeliver such Cars to you on demand. "4. If any Cars repurchased by us hereunder have suffered material damage directly resulting from one collision, because of which the purchasers have failed to pay for the Cars, necessitating repossession by you, you will cause such damage to be repaired upon your written order, or will make allowance to cover the actual cost of repairing such damage, which shall include only the actual cost of parts and direct labor and shall not include any repairs or replacements, which are not the direct result of and necessitated by such collision. The cost to you of such repairs or allowance therefor shall not exceed - (a) the unpaid balance owing you *7 on the Notes relating to such Cars, or (b) the standard insurance appraisal value of such Cars at the time of repossession, whichever is lower. If any car is covered by collision insurance, and the repairs thereto are made by us, you will allow to us such amount not covered by the insurance settlement, by reason of the deductible clause in the policy of insurance, as is necessary to cover the actual cost of the repairs, as aforesaid. "5. It is agreed that our loss, (if in excess of $1,000,00), arising out of Cars repurchased by us from you under this Agreement, and resold by us within 90 days from the date of delivery by you to us of such Cars, shall not exceed 3% of the aggregate principal amount of all Notes purchased by you during the respective 12 month period, from the date hereof, in which the Notes in respect to such Cars were purchased by you from us, plus an amount, equal to the total reserve above mentioned, set up during the same period by you for us whether or not held by you or paid over to us. Such loss shall be determined by the difference between the amount we realize from the sale of such repossessed automobiles and the amount we pay you for the same. Upon request *8 we will furnish you with all desired information, and we will allow you to examine our records relating to such Cars, to assist in determining such limit of loss. "6. In making settlement for the repurchase of any repossessed Car as provided in Paragraph 3 hereof, or for any Car damage by collision, as provided in Paragraph 4 hereof, if the down payment made by the purchaser of such Car was less than one-third of the cash delivered price of such Cars, we also shall be liable for the difference between the down payment actually made by the purchaser and an amount equal to one-third of the cash delivered price of such Car, subject to credit for the proportionate amount of the shortage included in the instalments paid by the purchaser. Any losses sustained by us as a result of inadequate down payments, as herein provided, shall not be taken into consideration in computing our losses as provided in Paragraph 5 hereof. "7. This Agreement shall be irrevocable until all Notes purchased hereunder by you from us shall have been paid in full to you, and shall inure to the benefit of and bind your and our respective heirs, personal representatives, successors and assigns, and any company *9 or organization subsidiary to or affiliated with you to whom you may assign this Agreement and Notes purchased from us hereunder and/or cause to purchase Notes from us herein set forth. We hereby waive notice of non-payment, repossession, acceptance of this Agreement by you and all other notices to which we might otherwise be entitled by law." Upon petitioner's sale of conditional sale agreements under the "Reserve Agreement", Commercial held back the amount specified in the agreement and credited a reserve account on its books for such amount. Petitioner credited the amount held back by Commercial to an account shown on its books as "Finance Company Reserve", and petitioner made an offsetting entry in an account entitled "Reserve for Repossession." The credits to the "Finance Company Reserve" were $5,852.42 during the fiscal year 1951, and $20,542.02 during the fiscal year 1952. These amounts were not carried through to or reflected in the gain or loss account on the petitioner's books and were not reported as taxable income for the taxable periods involved. At the close of the fiscal years 1951 and 1952, no part of the foregoing amounts credited to petitioner by Commercial *10 had been paid to petitioner, but were held by Commercial for the purposes and in accordance with the terms of the "Reserve Agreement." Subsequent to the taxable periods involved herein, Commercial, in accordance with the terms of the "Reserve Agreement", applied certain amounts of the reserve against indebtedness that petitioner owed it. At all times material herein, Commercial was in such sound financial condition that it was able to pay any amounts which became payable to petitioner. There was no interlocking ownership of stock between petitioner and Commercial Credit Corporation. The balance sheet made part of petitioner's return for each of the taxable years, includes among assets an amount for "Finance company repossession reserves", and it also includes among liabilities, as a reserve for contingencies, "Finance company repossession losses." Petitioner included in and made part of its return for each taxable year a "Statement of Operations." The statement includes in income, "Bad debts recovered", and "Finance reserve income (net)"; and it includes in deductions, "Bad debts." Opinion The evidence in this case is limited. It consists of an agreed statement, or stipulation, *11 of facts together with a few exhibits. There is no testimony. Accordingly, the record does not contain explanations of some of petitioner's operations and accounting practices. About these matters we are left to make assumptions from the exhibits. During the fiscal years 1951 and 1952, the finance company, Commercial held back out of the total sum for which it bought automobile notes and conditional sales contracts from petitioner, as reserves, $5,852.42, and $20,542.02, respectively, and it appears that no part of such amounts was released to petitioner during each fiscal year. Petitioner treated as income earned and accrued in each fiscal year only the sums which the finance company released to it during a fiscal year. The respondent, in determining each deficiency, included in petitioner's taxable income, under section 22 of the 1939 Code, the amount of the credits in each fiscal year to the so-called "reserve account," the credits being the withheld portions of the prices at which Commercial purchased from petitioner the automobile notes and contracts which petitioner obtained from its vendees of automobiles. The respondent's determinations were made, according to his argument *12 on brief, because petitioner keeps its books and reports its income on an accrual basis, and because "the amounts credited to the reserve account were accruable when the conditional sale contracts were sold inasmuch as petitioner's right to receive the account became fixed and absolute at that time." Respondent contends that the only limitation which the Reserve Agreement with Commercial places on the receipt by petitioner of the amounts which were credited to the "reserve account" relates to when and how payments out of the "reserve account" will be made. Respondent contends that it is the right to income which determines when it shall be accrued rather than immediate receipt or actual receipt. Respondent relies upon ; ; and Blaine Johnson, 25 T.C. - (No. 20, filed October 27, 1955). The petitioner acknowledges acquaintance with the above cited authorities but argues that they do not apply here because the collection by the petitioner of the amounts credited by Commercial to the reserve is "highly doubtful." The facts here are substantially the same as the facts in *13 , and petitioner has not presented evidence establishing facts which take this case out of the scope of the rule of the authorities cited above. This Court has followed and applied the reasoning of the Shoemaker-Nash case in several unreported Memorandum decisions in which arguments such as petitioner advances have been rejected. The reasoning of this Court in the Shoemaker-Nash case, at pages 423 and 424, applies in this case and we adhere to the views there expressed. See also, Blaine Johnson, supra, where we said: "To this we need only add that if because of uncollectible notes some part of the reserve is witheld, petitioner's compensation for that part will come by way of a specific bad debt charge-off." It is our understanding of the facts in this cas,e that the amounts withheld by the finance company when it bought automobile notes and contracts from petitioner, i.e., the "reserves," did not belong to the finance company but, rather, belonged to petitioner, and were withheld by the finance company to protect it against losses. It is also our understanding that petitioner, in its books, does not carry a "bad debt reserve", but, instead, *14 operates its business on a specific charge-off of bad-debts basis. The respondent's determination is sustained on the authority of It is held that the entire amounts of the selling prices of the automobile notes were accruable at the time the notes were sold to the finance company. Accordingly, the Commissioner properly restored to petitioner's net income for each taxable year the "dealer reserves" withheld by Commercial. Petitioner endeavors to avoid the impact of , by reference to . We have previously considered the reasoning of the court in the Keasbey & Mattison Co. case and have concluded that we are unable to accept the distinction of the Shoemaker-Nash case which the court made. See Blaine Johnson, supra. Decision will be entered for the respondent.